| | | |
|---|---|---|
| CRESCENCIO ORTEGA, | ) | |
| | ) | |
| Plaintiff, | ) | No. 14 C 06669 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| DUE FRATELLI, INC. and MARIO | ) | |
| ALIANO, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Cresencio Ortega alleges that his former employer, Aliano's Ristorante (which is operated by Due Fratelli, Inc.) and Mario Aliano (the owner and president of Due Fratelli, Inc.), did not pay overtime wages in violation of the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.*, and the Illinois Minimum Wage Law, 820 ILCS § 105/1 *et seq.*[1] Ortega now moves for partial summary judgment on liability only. For the reasons discussed below, the Court grants Ortega's motion in part and denies it in part.

## I. Background

In deciding Ortega's motion for summary judgment, the Court views the evidence in the light most favorable to Defendants, the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

---

[1]The Court has subject matter jurisdiction over the federal FLSA claims under 28 U.S.C. § 1331; 29 U.S.C. § 201 *et seq.* The Court has supplemental jurisdiction over the state law IMWL claims under 28 U.S.C. § 1367(a) because "they form part of the same case or controversy."

Defendant Mario Aliano owns a company called Due Fratelli, Inc., which operates an Italian restaurant called Aliano's Ristorante in Batavia, Illinois. PSOF ¶¶ 14, 16; R. 44, Aliano Aff. ¶ 2.[2] Aliano's has annual revenues of around one to two million dollars. PSOF ¶ 4; R. 43-1, Exh. 1, Aliano Dep. 7:19-10:3. Plaintiff Cresencio Ortega worked as a cook for Aliano's from May 2012 to November 2013. PSOF ¶ 1; R. 43-4, Exh. 4, Ortega Dep 23:16-24:14. During that time, he was responsible for preparing food and completing tasks assigned by the chef. PSOF ¶ 2; Ortega Dep. 13:7-13. Although Ortega testified in his deposition that his wage started at $10 per hour and later increased to $11 or $12, Ortega Dep. 21:17-22:18, he now agrees with Defendants ("for the purposes of this motion only") that his hourly rate was $10 per hour throughout the entire course of his employment. PSOF ¶ 3. Each workday, Ortega punched in and out on a time clock and submitted a time card at the end of each workweek. Aliano Dep. 25:1-10; R. 36-4, Exh. D, Ortega Timecards. Each workweek began on Monday and ended on Sunday, and Ortega often worked six or seven days and over forty hours each week. Ortega Timecards. After the end of each week, Mario Aliano wrote Ortega a check (issued by Due Fratelli, Inc.) for that week's wages, although Ortega received cash for the first few weeks of the job. PSOF ¶¶ 8, 22; Ortega Dep. 16:2-9; R. 36-3, Exh. C, Ortega Checks. The parties

---

[2]Citations to the record are noted as "R." followed by the docket number and the page or paragraph number. Citations to the parties' Local Rule 56.1 Statements of Fact are "PSOF" (for Ortega's Statement of Facts) [R. 36]; "Defs.' Resp. PSOF" (for Defendants' Response to Ortega's Statement of Facts) [R. 42]; "DSOF" (for Defendants' Statement of Facts) [R. 43]; "Pl.'s Resp. DSOF" (for Ortega's Response to Defendants' Statement of Facts) [R. 47]. Where a fact is admitted, only the asserting party's statement of facts is cited; where an assertion is otherwise challenged, it is so noted.

disagree, however, about precisely when these payments were made—whether shortly after the workweek ended, or quite some time after. R. 41, Defs.' Resp. at 5-8; R. 46, Pl.'s Reply at 4. Aliano's did not withhold any state or federal taxes from Ortega's paycheck, and Ortega received a 1099 tax form at the end of the year. PSOF ¶ 6; R. 43-2, Exh. 2, 1099 Forms; Aliano Dep. 34:4-14. (As noted later in this Opinion, the defense concedes that Ortega was an employee and was not an independent contractor. Defs.' Resp. PSOF ¶ 5.)

Ortega claims that Aliano's did not pay him overtime wages as required by law and brought suit under the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.*, and the Illinois Minimum Wage Law, 820 ILCS § 105/1 *et seq.* Although he originally brought his federal claims both individually and on behalf of similarly situated individuals under the FLSA's collective-action provision, 29 U.S.C. § 216(b), R. 1, Compl. ¶ 2, Ortega later dropped his collective action and continued only on an individual basis, R. 21, 5/20/15 Minute Entry. Ortega now moves for partial summary judgment on liability under the FLSA and IMWL, arguing that the undisputed facts show that Aliano's failed to pay him his full overtime wages. R. 34, Pl.'s Mot. Summ. J. Ortega wishes to prove the specific amount of damages at trial. R. 35, Pl.'s Br. at 9.

## II. Legal Standard

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the

evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating summary judgment motions, courts must view the facts and draw reasonable inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). The Court may not weigh conflicting evidence or make credibility determinations, *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011), and must consider only evidence that can "be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). The party seeking summary judgment has the initial burden of showing that there is no genuine dispute and that she is entitled to judgment as a matter of law. *Carmichael v. Village of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). If this burden is met, the adverse party must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.

### III. Analysis

### 1. FLSA "Enterprise"

Before addressing the merits of the overtime-liability issue, Defendants first argue that Aliano's is not an "enterprise" under the FLSA, and thus is not covered by the statute. Defs.' Resp. at 2-4. The FLSA requires an employer to pay overtime to "*any of his employees* who in any workweek is engaged in commerce or in the production of goods for commerce, *or is employed in an enterprise* engaged in commerce or in the production of goods for commerce." 29 U.S.C. § 207(a)(1)

(emphases added). Thus, Ortega must show either "(1) coverage for [Aliano's] as an enterprise, or (2) coverage for [himself] as [an] individual employee[] engaged in interstate commerce, regardless of [Aliano's] status as an enterprise."[3] *Shoemaker v. Lake Arbutus Pavilion, LLC*, 2015 WL 3965904, at *2 (W.D. Wis. June 30, 2015). Ortega does not argue that he should be covered as an individual employee engaged in commerce; rather, he relies on Aliano's status as an enterprise under the FLSA. Pl.'s Br. at 7-8.

The FLSA defines an "enterprise engaged in commerce," 29 U.S.C. § 207(a)(1), as an employer that

> (i) has employees engaged in commerce or in the production of goods for commerce, or that has employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person; and (ii) is an enterprise whose annual gross volume of sales made or business done is not less than $500,000 … .

29 U.S.C. § 203(s)(1)(A). Because Defendants admit that Aliano's has more than $500,000 in annual gross sales, Defs.' Resp. PSOF ¶ 4, the only question is whether Aliano's "has employees engaged in commerce or in the production of goods for commerce, or that has employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person." § 203(s)(1)(A)(i). The second part of this definition—"employees handling, selling, or otherwise working on goods or materials" in commerce—is quite broad. *See Radulescu v. Moldowan*, 845 F. Supp. 1260, 1264 (N.D. Ill. 1994). In the 1974 FLSA amendments, Congress expanded enterprise coverage so that an employee did not

---

[3]Defendants admit that Ortega is an "employee" under the FLSA and IMWL and withdraw their original contention that he was an independent contractor. Defs.' Resp. PSOF ¶ 5.

5

have to make goods that enter the stream of interstate commerce—rather, the employee need only "handle goods or materials *that have moved or been produced in interstate commerce*." *Id.* (emphasis added). In one case, the enterprise theory covered apartment-building janitors who "used and handled supplies manufactured outside of Illinois and shipped into the state," including "pipes, faucets, nails, windows, door locks, light bulbs, grass seed, detergents, waxes, brooms, garbage bags, and salt for sidewalks." *Id.* at 1264-65. In another example, a local cleaning company was an enterprise because its "maids handled goods that traveled in interstate commerce," such as "cleaning products not manufactured in Illinois." *Harris v. Skokie Maid & Cleaning Serv., Ltd.*, 2013 WL 3506149, at *5 (N.D. Ill. July 11, 2013). Notably, "the ultimate determination whether the employer is an enterprise subject to FLSA's requirements is ordinarily the court's province, not the jury's." *Hicks v. Avery Drei, LLC*, 654 F.3d 739, 747 (7th Cir. 2011) (citations and quotations omitted); *see also Shoemaker*, 2015 WL 3965904, at *2 (whether a company is an enterprise "is a question of law for the court, even though it is based on a factual determination.").

Ortega argues that Aliano's employees handled, sold, or otherwise worked on goods involved in interstate commerce because Defendants admitted to purchasing food and supplies from "national" vendors like Sysco Foods, Greco, and US Foods. Pl.'s Br. at 7-8; Aliano Dep. 8:11-20. And the kitchen employees (comprised of four cooks) handled these supplies. Pl.'s Reply at 2-3; Aliano Dep. 9:17-10:22. Defendants respond, however, that the vendors' status as national companies is not enough to

show that any goods ultimately delivered to Aliano's actually crossed state lines. Defs.' Resp. at 3. They further argue that Aliano's often purchased food and supplies locally. *Id.* at 4; Aliano Aff. ¶ 3. So, according to Defendants, Ortega has failed to prove that Aliano's is an FLSA enterprise. Defs.' Resp. at 4.

Even though "virtually every enterprise in the nation doing the requisite dollar volume of business is covered by the FLSA," *Dole v. Bishop*, 740 F. Supp. 1221, 1226 (S.D. Miss. 1990) (citing *Dunlop v. Industrial America Corp.*, 516 F.2d 498, 501-02 (5th Cir. 1975)), the Court concludes that the record is unclear as to enterprise status because Ortega has done an insufficient job proving up the issue, at least for right now.[4] Ortega relies on only one fact: that Aliano's purchased food and supplies from "national" vendors like Sysco and US Foods. Pl.'s Reply at 2-3. But Ortega provides no *record* evidence to determine the source of the vendors' shipments, or that the vendors shipped food to Aliano's across state lines; the Court

---

[4]Ortega's attorneys submitted briefs that contained substantial problems. In one brief, a paragraph is repeated almost verbatim, Pl.'s Br. at 11 (repeating the paragraph beginning "Plaintiff worked 69.5 hours during the week of January 14, 2013 to January 20, 2013."), requiring the Court to read and re-read and re-read again the paragraph to try to detect any substantive differences. And in the Reply, multiple place-holders for citations were never filled-in:

> Defendants' own motion demonstrates that Plaintiff was not paid overtime for all weeks worked. (cite to their chart in their motion). And, as set forth in Plaintiff's principal motion, the failure by Defendants to pay overtime in any single workweek entitles Plaintiff to a finding of judgment on liability – the only thing left to determine is damages. *Estrella v. P.R. Painting [cite]*. Defendants cannot apply "overpayments" from subsequent workweeks to cover underpayments made in other workweeks – such a process fails to comply with the overtime provisions of the FLSA. *Howard [cite]*

Pl.'s Reply at 5. Also, in responding to Defendants' Statement of Facts about Ortega's breaks, Ortega's attorneys accidentally left in a private comment: "Not disputed for the purposes of this motion, only. [Do we have record evidence to dispute this anywhere?]" Pl.'s Resp. DSOF ¶ 19.

cannot just assume that the food came from outside Illinois merely because the vendors are large and operate nationally. In Aliano's deposition, Ortega asked only one question about the source of Aliano's food and failed to follow up. Aliano Dep. 8:11-20. Furthermore, because Aliano declared that he purchased food and equipment from local vendors, Aliano Aff. ¶ 3, there is a factual dispute about whether the employees handled local or interstate supplies.[5]

Because the record is unclear as to the enterprise issue and because it would be inefficient to have a bench trial on this issue, the Court gives Ortega two options: he can (1) move again for summary judgment on this issue by filing a motion supported with specific, already-issued discovery requests and already-given answers on the source of Aliano's goods; or (2) in the event that Ortega did not issue discovery requests or subpoenas on the enterprise element, the Court will re-open limited discovery on it.[6] The parties must confer on these two options by December 14, 2015, and inform the Court of their discussions at the next status hearing, when

---

[5]The Court points out, however, that Mario Aliano's affidavit is barely admissible, with no outright statement that *all* of the goods are locally produced, nor any details about whether the affidavit covers the *entire* relevant time period, nor any details about how often he orders locally, from what local vendors, what types of supplies he ordered locally, or the percentage of his supplies that were purchased locally as opposed to from interstate vendors. *See Hadley v. Du Page Cty.*, 715 F.2d 1238, 1243 (7th Cir. 1983) ("Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter, rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted."). It also appears that the affidavit is crafted in general and vague terms to leave open as many options as possible and avoid a direct contradiction with Aliano's deposition. At this summary-judgment stage, however, this affidavit may be considered and all inferences must be drawn in Defendants' favor.

[6]Re-opening discovery is appropriate because preparing for and conducting a bench trial on this issue would be wasteful. Even if Ortega did not issue discovery that could have resolved this simply, he would still be allowed to pose under-oath questions to Aliano about this issue at the bench trial.

the Court will determine details and set a schedule for the additional discovery, if Ortega goes that route. The defense might also consider whether it really is sensible to dispute this element, when discovery likely will show that Aliano's is indeed a covered enterprise. Needless litigation on this point will only drive-up the cost of the defense and the cost of a potential settlement. In any event, Ortega's motion for summary judgment on the enterprise issue is denied without prejudice.

## 2. Mario Aliano's Individual Liability

Ortega next argues that Aliano is individually liable under the FLSA and IMWL. Defendants do not dispute this in their briefing, and the Court grants Ortega's motion for summary judgment on this issue. The FLSA holds liable any employer, which is defined as "any person acting directly or indirectly in the interest of an employer in relation to an employee … ." 29 U.S.C. § 203(d). The statute contemplates "[j]oint liability, in which more than one employer is liable for the same underpayment of wages … ." *Reynoso v. Motel LLC*, 71 F. Supp. 3d 792, 796 (N.D. Ill. 2014); *see also Luder v. Endicott*, 253 F.3d 1020, 1022 (7th Cir. 2001) (explaining "that the supervisor who uses his authority over the employees whom he supervises to violate their rights under the FLSA is liable for the violation."). To determine whether an individual is an employer under the FLSA, courts look at the "economic reality" of the parties' relationship. *See Perez v. Super Maid, LLC*, 55 F. Supp. 3d 1065, 1075 (N.D. Ill. 2014) (citing cases). Under this test, an individual is an employer if she "(1) had the power to hire and fire the employees; (2) supervised and controlled employee work schedules or conditions of employment; (3)

determined the rate and method of payment; and (4) maintained employment records." *Id.* (citations omitted) (holding that a company's owner and president was an employer because he "manag[ed] the day-to-day operations of the business, including hiring, work schedules, discipline, and pay."); *see also Reynoso*, 71 F. Supp. 3d at 797 (the owner of a motel was individually liable because "there was no one with more authority over the terms and conditions of employment").

Here, Ortega has shown that Mario Aliano was a statutory employer as the president and owner of Due Fratelli, the company that operates Aliano's. Aliano Aff. ¶ 2. Aliano was responsible for the day-to-day operations of the restaurant, which has no other supervisors or managers. Aliano Dep. 11:4-17. Aliano was the sole manager responsible for hiring and firing employees and determining the employees' wages. *Id.* He was also responsible for issuing written and oral discipline to his employees. *Id.* 11:23-12:9. Aliano was in charge of payroll: he would collect the timecards at the end of each week and give them to his accountant. Aliano Dep. 37:6-12. The accountant would then tell Aliano the amount of the employees' paychecks, and Aliano would write the checks and pass them out to his employees. *Id.* 7:1-13, 30:18-31:14. Nobody else had authority to write checks from the company's account. *Id.* 12:7-9. As the boss, Aliano had the ultimate authority over his employees, and his "position as [the restaurant's] sole owner and president coupled with his extensive oversight of [the restaurant's] operations show that the economic reality of the working relationship here supports individual liability." *Perez*, 55 F. Supp. 3d at 1075.

Similarly, the same form of individual liability also appears to apply under the IMWL (and the defense does not contest this point). *See, e.g.*, *Park v. Dundee Mkt. III, Inc.*, 2014 WL 6617030, at *3 (N.D. Ill. Nov. 20, 2014) (citing cases) (applying the "economic reality" test to the plaintiff's IMWL claims). Thus, the Court grants summary judgment to Ortega on this issue and holds that Mario Aliano is an "employer" who can be held individually liable under the FLSA and IMWL.

### 3. Overtime Liability

### A. Overtime Payment Calculations

Ortega also moves for summary judgment on overtime liability under the FLSA and IMWL for the ten workweeks ending: December 23, 2012; January 6, 2013; January 20, 2013; February 9, 2013; March 10, 2013; March 24, 2013; March 31, 2013; April 7, 2013; April 14, 2013; and April 21, 2013. Pl.'s Br. at 10-12. Ortega argues that because the record conclusively shows that he was underpaid during these weeks, only damages are left for trial. *Id.* at 9. The Court will apply FLSA principles to the IMWL claims, because "[c]laims brought under the FLSA and IMWL are evaluated using the same general analysis." *Dominguez v. Quigley's Irish Pub, Inc.*, 790 F. Supp. 2d 803, 811 (N.D. Ill. 2011). *See also, e.g.*, *Condo v. Sysco Corp.*, 1 F.3d 599, 601 n.3 (7th Cir. 1993) (explaining that the FLSA and IMWL are "coextensive and, therefore, if the system used by [the defendant] to compensate [the plaintiff] for working overtime complies with the FLSA, it also complies with Illinois law."); 56 Ill. Admin. Code § 210.120 ("For guidance in the interpretation of

the [IMWL] … , the Director [of the Illinois Department of Labor] may refer to the Regulations and Interpretations of the Administrator, Wage and Hour Division, U.S. Department of Labor, administering the Fair Labor Standards Act of 1938, as amended (29 U.S.C. 201 *et seq.*)").

Under the FLSA, an employer must pay its employee overtime wages—at the rate of 150% of the employee's regular hourly wage—for each hour worked over forty hours each week. 29 U.S.C. 207(a)(1) ("no employer shall employ any of his employees … for a workweek longer than forty hours unless such employee receives compensation … at a rate not less than one and one-half times the regular rate at which he is employed."). The parties agree that Ortega's hourly rate was $10 per hour throughout the course of his employment at Aliano's. Defs.' Resp. PSOF ¶ 4. So Ortega's overtime rate was $15 per hour. Pl. Br. at 10. The parties also agree that Ortega took a half-hour break each workday. Pl.'s Resp. DSOF ¶ 19. Ortega has provided the weekly timecards for the particular weeks mentioned above, R. 36-4, as well as the checks he received, R. 36-3. Based on these documents, Defendants put together the following chart, and the Court has highlighted in yellow the weeks identified by Ortega:

| Week Ending | Hours Worked By Plaintiff | Days Worked By Plaintiff | Break Time Taken By Plaintiff (In Hours) | Total Compensation Due | Deposited Check Number | Deposited Check Amount | Deposited Check Date | Additional Check Deposited Number | Additional Check Deposited Amount | Additional Deposited Check Date | Over/Under Compensated For Week |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 12/23/2012 | 68 | 7 | 3.5 | $767.50 | 6227 | $680.00 | 12/27/2012 | | | | -$87.50 |
| 12/30/2012 | 46.25 | 5 | 2.5 | $456.25 | 6069 | $506.00 | 1/3/2013 | | | | $49.75 |
| 1/6/2013 | 68.25 | 7 | 3.5 | $771.25 | 6248 | $748.00 | 1/10/2013 | | | | -$23.25 |
| 1/20/2013 | 69.5 | 7 | 3.5 | $790.00 | 6449 | $759.00 | 1/24/2013 | 6452 | $100.00 | 1/24/2013 | $69.00 |
| 2/3/2013 | 63 | 7 | 3.5 | $692.50 | 6431 | $745.00 | 2/7/2013 | | | | $52.50 |
| 2/17/2013 | 61.25 | 7 | 3.5 | $666.25 | 7417 | $693.00 | 2/21/2013 | | | | $26.75 |
| 3/10/2013 | 60 | 6 | 3 | $655.00 | 7508 | $646.25 | 3/14/2013 | 7452 | $63.00 | 3/9/2013 | -$54.25 |
| 3/24/2013 | 59.5 | 6 | 3 | $647.50 | 7298 | $654.00 | 3/28/2013 | | | | $6.50 |
| 3/31/2013 | 55 | 6 | 3 | $580.00 | 7342 | $605.00 | 4/4/2013 | | | | $25.00 |
| 4/7/2013 | 63.25 | 6 | 3 | $703.75 | 7101 | $695.00 | 4/11/2013 | | | | -$8.75 |
| 4/14/2013 | 60 | 6 | 3 | $655.00 | 7356 | $660.00 | 4/18/2013 | | | | $5.00 |
| 4/21/2013 | 56.5 | 6 | 3 | $602.50 | 7367 | $621.50 | 4/26/2013 | | | | $19.00 |
| | | | | | | | | | | TOTAL | $188.25 |

R. 41-1, Exh. A, Defs.' Chart. (There are only nine weeks highlighted on this chart; below, the Court will discuss the tenth week ending on February 9, 2013.) The parties largely agree with the facts stated on this chart (at least for the highlighted parts), including the hours Ortega worked each week and the number of days he worked each week, all of which are shown on Ortega's timecards. They also agree on the total break time (a half-hour each day multiplied by the number of days he worked that week) and the total compensation due (total hours are the hours worked minus break time; the first forty hours of this total time should have been paid at $10/hour, and the remaining hours over forty should have been paid at $15/hour). The parties also generally agree on the deposited check amount, except for a few instances described below. The final column—"Over/Under Compensated for Week"—shows the total deposited check amount minus the total compensation due. If negative, it shows that Ortega was *owed* overtime payments that week; if positive, it means that Ortega was actually *overpaid* that week.

Although Ortega does not explicitly address this issue, his pleadings suggest that he disputes the data on two of the highlighted weeks: January 20 and March

10, 2013. On Defendants' chart, both of these weeks include additional payments (on top of the initial deposited check) that Ortega does not include in his calculations. For example, for the week of January 20, Ortega says that he was only paid $759, R. 36-6, Exh. F, Ortega Aff. ¶ 8, but Defendants say that he was actually paid $859, Defs.' Chart. The additional $100 came from an additional check, which Defendants attached to their statement of facts. R. 43-5, Exh. 5, Ortega Additional Checks at 1. Aliano wrote check number 6452 to Ortega on January 24, 2013 for $100, and this check later posted on January 28, 2013. *Id.* Because Ortega provides no evidence or argument disputing that this additional $100 was payment for the workweek ending January 20, the undisputed evidence shows that Ortega was in fact paid $859 that week. Using these numbers, Aliano's did not underpay Ortega that week; in fact, Ortega was actually *overpaid* by $69 that week. Defs.' Chart.

Similarly, although Ortega argues that he was paid $646.25 for the week ending March 10, 2013, Ortega Aff. ¶ 10, Defendants believe that Ortega was paid an extra $63 for a total of $709.25. Defs.' Chart. Defendants also provided evidence of check number 7452 issued to Ortega on March 9, 2013, for the amount of $63 that was posted on March 14, 2013. Ortega Additional Checks at 2. So again, because Ortega does not dispute the validity or purpose of this check (even though the check was issued one day before the workweek ended), the undisputed evidence shows that Ortega was in fact paid $709.25 for the week of March 10. Using these numbers, Ortega was overpaid by $54.25 that week. Defs.' Chart.

In addition, Ortega argues that he was underpaid for the week of February 3, 2013 to February 9, 2013, which is a week that is not reflected on Defendants' chart. Pl.'s Br. at 11-12. Ortega believes that he was issued check 7401 on February 15, 2013 for $700, Ortega Checks at 5; Ortega Aff. ¶ 9, and that he worked 63 hours that week, Pl. Br. at 11. It seems, however, that Ortega made a mistake matching the timecard with its appropriate week; there is a timecard labeled "2/3/13" with 63.0 hours listed. Ortega Timecards at 4. The workweeks always ran from Monday to Sunday. *See id.* So because February 3, 2013 was a Sunday, this timecard must have been for January 28 to February 3. February 3 to February 9, 2013 on the other hand, was Sunday through Saturday.

Supposing, then, that Ortega *meant* to argue that he was underpaid for the week ending February 3 (and not February 9) when he received a $700 check for 63 hours, Ortega Checks at 5; Ortega Aff. ¶ 9, Defendants would counter that he was actually paid $745 that week with check 6431, Defs' Chart; Ortega Additional Checks at 4. On this evidence, the Court cannot determine whether Ortega was paid $700 or $745 for the week of February 3. But this does not matter, because neither amount establishes overtime liability. Either way, Ortega should have been paid for 59.5 hours that week (63 hours minus a half-hour break for each of the seven days he worked, as listed on the timecard), so he was owed $400 for his regular time (40 hours at $10/hour) and $292.5 for his overtime (19.5 hours at $15/hour), for a total of $692.5. Both the $700 and $745 amounts are larger, so Ortega would have been adequately paid in either scenario.

In sum, because the undisputed evidence shows that Defendants' chart is accurate for the weeks that Ortega identified, there are only three weeks in which Ortega was not paid the appropriate overtime amounts: December 23 (underpayment of $87.50); January 6 (underpayment of $23.25); and April 7 (underpayment of $8.75). Based on these three weeks, Defendants initially appear to have violated the FLSA. Defendants, however, offer a reason for these underpayments, which the Court addresses next.

## B. Delay in Overtime Payments

While "Plaintiff's comparisons seemingly show that Defendants are liable to Plaintiff pursuant to the FLSA and IMWL," Defendants argue that this is not actually the case because Aliano's paid the overtime shortages to Ortega in later weeks. Defs.' Resp. at 5-9.[7] According to Defendants, Aliano's sometimes could not pay on time because Ortega submitted non-compliant timecards by not documenting his breaks. Aliano Aff. ¶ 6. Defendants argue that Ortega also took his timecards home at the end of the week and would not return them promptly. *Id.* ¶ 7. Because Ortega failed to submit timely and complaint timecards, Aliano had to approximate his hours for certain weeks, sometimes causing an underpayment. *Id.* ¶¶ 8, 11. After Aliano could determine the number of hours that Ortega actually worked, he adjusted Ortega's paycheck by giving him more or less money on the next paycheck. *Id.* ¶ 12. Thus, Defendants argue that any underpayment in overtime was not only

---

[7]Defendants' argument that the *annual* amount of money Ortega declared on his 1099 form is about equal to what he should have been paid, Defs. Resp. at 4-5, is beside the point. Defendants understand that the FLSA determines liability on a workweek basis (and not on an annual basis), *id.* at 6, so their inclusion of this argument is puzzling.

out of Aliano's control but was also ultimately paid as soon as possible. Defs.' Resp. at 6.[8]

Generally, overtime compensation must be paid on the regular pay day for the period in which that workweek ended. 29 C.F.R. § 778.106. This requirement prevents employers from taking advantage of employees by forcing them to work overtime and delaying payment for an extended period of time. *Howard v. City of Springfield, Illinois*, 274 F.3d 1141, 1148 (7th Cir. 2001). Prompt payments "protect workers from the twin evils of excessive work hours and substandard wages"; otherwise, an employer could put off payments for any reason—for example, until its financial circumstances improved or when it finally got around to its bookkeeping. *Id.* "Thus, the statute is violated even if the employer eventually pays the overtime amount that was due." *Id.* (citation omitted).

An exception exists, however, when the employer has a legitimate reason for delaying payments. *See* 29 C.F.R. § 778.106. In the event of "natural disasters or similar events wholly beyond the control of the employer," an employer does not violate the statute when it makes late payments. *Dominici v. Bd. of Educ. of City of Chicago*, 881 F. Supp. 315, 320 (N.D. Ill. 1995). This must be an "exceptional circumstance" not caused by an employer; for example, "[a]n employer may not set up an inefficient accounting procedure and then claim it is not responsible for timely payment of wages due to its own incompetence." *Id. See also Powers v.*

---

[8]The Court again points out that Aliano's affidavit is devoid of detail. Aliano does not state what weeks Ortega allegedly had timecard violations, when and how Ortega finally returned compliant timecards, how Aliano specifically made the payment estimates, and so on. Aliano Aff. ¶¶ 6-12.

*Centennial Commc'ns Corp.*, 679 F. Supp. 2d 918, 924 (N.D. Ind. 2009) (employer's policy of paying overtime over a month after it was earned was invalid because "the subsequent delay in overtime payment [was not] due to some difficulty in crunching the numbers or other pragmatic considerations"), *amended on reconsideration on other grounds*, 2010 WL 746776 (N.D. Ind. Feb. 26, 2010). In such an exceptional scenario, an employer must "pay[] the excess overtime compensation as soon after the regular pay period as is practicable. Payment may not be delayed for a period longer than is reasonably necessary for the employer to compute and arrange for payment … ." 29 C.F.R. § 708.106.

If Defendants' version of the facts is true, then the delay in paying Ortega would have been reasonable and there would be no FLSA violation for circumstances out of their control, such as Ortega's failure to comply with timecard policy. In that scenario, the three underpayments previously identified—December 23 ($87.50), January 6 ($23.25), and April 7 ($8.75)—total $119.50 and was made up in later weeks. Defs.' Chart. According to Defendants' chart, which is largely undisputed by Ortega (aside from the instances previously discussed), Ortega was not only repaid the overtime but ultimately *overpaid* $188.25 for the time period between December 23, 2012 to February 21, 2013. This $188.25 figure is likely imprecise, however, because it is based only on data for the weeks in which timesheets and checks exist. And there are several weeks from May 2012 to November 2013 where records are missing.[9] Nevertheless, Defendants have shown

_____

[9]There is an additional reason to believe that Defendants' chart might not be entirely accurate. For the week ending February 17, 2013, for example, Defendants submit

a disputed issue of fact as to these subsequent overtime payments, precluding summary judgment.

Ortega offers three arguments why the record evidence conclusively establishes that the later payments were not credits for past-due overtime: (1) Aliano stated in his deposition that he collected the timecards at the end of each week; (2) Aliano made no mention in his deposition of any issues with Ortega's timecards; and (3) none of the checks indicated that they were covering an outstanding balance. Pl.'s Reply at 4. These arguments miss the mark because Ortega presents no evidence disputing Defendants' version of the events. As to Ortega's first argument, Aliano was asked during his deposition: "Q. Okay. Who would collect the timecards at the end of week? A. Myself. Q. You would collect them and you would give them to your accountant? A. Yes." Aliano Dep. 37:7-12. During this portion of the deposition, Aliano was asked *generally* about his timecard procedures—so when he answered, he was not discussing Ortega or any other specific employee. As to the second contention about Aliano failing to mention any issues with Ortega's timecards in his deposition, a review of the entire deposition transcript reveals that Ortega asked Aliano no questions about the late timecards (nor did Ortega cite to any questions that would have covered the issues, such as "Do you dispute the accuracy of any of the timecards submitted by Mr. Ortega?", or "Did Mr. Ortega follow all company procedures in filling out the timecards?"). So

---

that check 7417 for $693 was paid on February 21, 2013. Defs.' Chart. But the memo line of this check says "week of 11-18." Ortega Additional Checks at 3. November 18, 2012 was, in fact, a Sunday—the end of a workweek—suggesting that this check was not payment for the week of February 17. But this is not one of the weeks that Ortega discusses in his brief. Pl.'s Br. at 10-12.

any lack of testimony on this topic cannot suggest that the timecard problems did not actually happen or that the defense is precluded from making the contention now.[10] Finally, that none of the checks indicated that they were making up for unpaid overtime also fails to dispute Defendants' explanation. There is no reason to believe that the checks were expected to contain that information; only one of the checks provided to the Court included *any* information about the corresponding workweek. *See* Ortega Additional Checks at 3 (check 6452 states "week of 11-18" in the memo line). Ultimately, Ortega offers no evidence to show that he did, in fact, submit his timecards on time and that there should have been no delay in receiving his overtime payments at the end of every workweek.

Therefore, viewing the evidence in the light most favorable to Defendants, the non-moving party, a jury could reasonably believe that Defendants compensated Ortega for unpaid overtime in later weeks because Ortega mishandled his timecards. Looking at Defendants' chart, it is difficult to imagine why else Aliano's would have paid Ortega too much in certain weeks, such as a $49.75 overpayment on the week of December 30, 2012 (though Ortega will no doubt testify at trial that Aliano's had increased his salary as time went on).[11] Thus, because there remains a

---

[10]In other words, Ortega does not point to any discovery request (and corresponding answer, or failure to answer) that would block the defense from asserting this argument.

[11]Defendants' explanation would be much less believable had Ortega continued to argue that (1) he did not take any breaks, as he had originally alleged in his complaint, Compl. ¶ 22; and (2) he made (at least) $11/hour in 2013, as Ortega had testified in his deposition, Ortega Dep. 21:22-22:18. Under those conditions, Ortega would have had a higher overtime wage of $16.50 and his hours would not have been reduced for breaks. On the week ending April 7, 2013, for instance, Ortega would have been owed $823.63 for working 63.25 hours (40 hours at $11/hour and 23.25 hours at $16.50/hour). Defs.' Chart.

dispute about whether overpayments were meant to cover previous overtime underpayments, summary judgment is denied on this issue.

## IV. Conclusion

For the reasons previously discussed, the Court grants in part and denies in part Ortega's motion for partial summary judgment, R. 34. Ortega's motion is granted on the issue of individual liability. Ortega's motion is denied without prejudice on the issue of enterprise status, and it is denied as to overtime liability.


ENTERED:


        s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: December 1, 2015

---

But Ortega was only paid $695 that week, for a shortage of $128.63. *Id.* This is much greater than the currently presented shortage of $8.75. *Id.* Assuming these facts, Ortega would have been underpaid almost all weeks, and there would have been few, if any, overpayments. But Ortega now concedes that he took a half-hour break each day and was paid $10/hour.